# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Lance Wickner,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Robert Bender, Thomas Cherro, Jeffrey Laine, Kevin Dreher, Jason Furey, Tyler Rosen,<br><br>　　　　　Defendants. | Case No. 12-cv-1452 (DWF/HB)<br><br><br>**REPORT AND RECOMMENDATION** |

Lance Wickner, 1111 Hwy. 73 Moose Lake, MN 55767, *pro se*

Anthony R. Noss, Minnesota Attorney General's Office, 445 Minnesota Street, Suite 100, Saint Paul, MN 55101, for Defendants.

HILDY BOWBEER, United States Magistrate Judge

Plaintiff Lance Wickner, a civilly committed client of the Minnesota Sex Offender Program ("MSOP"), brings this action alleging that Defendants violated his Fourteenth Amendment rights.[1]  Specifically, he contends that on April 26, 2012, Defendants Cherro, Bender, and Laine used excessive force against him, and that afterward, Defendants Dreher, Furey, and Rosen were deliberately indifferent to his serious medical needs arising out of the injuries he sustained as a result of the incident.  The matter now comes before the Court on Defendants' Motion for Summary Judgment [Doc No. 62].

---

[1] The operative pleading in this matter is the First Amended Complaint [Doc. No. 39], which was filed on October 12, 2017.

1

The motion was referred to the undersigned United States Magistrate Judge for the issuance of a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, the Court recommends the motion be granted.

## I.    BACKGROUND

During the relevant events, Plaintiff was civilly committed to the MSOP facility in Moose Lake, Minnesota.  (*See* Pl.'s Dep. at 16 [Doc. No. 65-1].)  He resided in Unit Omega 3, which was designated for clients with "behavioral problems."  (*Id*. at 42.)  All six Defendants in this action were employed by the Moose Lake MSOP facility as security counselors.  (*See generally* Defs.' Decls. [Doc. Nos. 67–73].)

On April 26, 2012, around noon, Plaintiff was using the unit computer for personal use.  (Noss Decl. Ex. D [Doc. No. 65-1 at 203].)   He was approached by security counselor Darien Menten, who told him that his computer access was limited exclusively to legal work due to his placement on "Restriction Status 3."[2]  (*Id.*)  Menten then gave Plaintiff several directives to stop using the computer.  (*Id.*)  Plaintiff did not comply and began "posturing with his fists clenched towards staff."  (*Id.*)  Plaintiff then went to his room, but returned with a pair of leather gloves, which he wore to protect his hands in a fight.  (Pl.'s Dep. at 39–40.)  He returned to the unit computer.  (Noss Decl. Ex. D [Doc. No. 65-1 at 203].)

At this point Menten called in an alert on the facility's Incident Command System

---

[2] Restriction Status 3 is a "disciplinary restriction[]" based on "client history or . . . behavior."  (Bornus Decl. Ex. A. at 3 [Doc. No. 67].)  An MSOP client on Status 3 is restricted "from all off-unit privileged activities and all on-unit privileged activities."  (*Id.*)

("ICS")—the system used when there is a security incident that warrants an emergency response team. (*Id.*; Pl.'s Decl. ¶ 24 [Doc. No. 78].) Defendants Jeffrey Laine, Robert Bender, and Thomas Cherro—members of the "A-Team"—responded to the unit. (Noss Decl. Ex. J [Doc. No. 65-1 at 217]; Laine Decl. at ¶ 11 [Doc. No. 68].) Activation of this system requires all clients to return to their individual rooms, but Plaintiff again did not comply. (Pl.'s Dep. at 83–84.) In his declaration, Plaintiff recounts: "I refused to get off the computer because the security counselor Darian Menten was not following the MSOP Policies and Procedures . . . I knew that Defendants Robert Bender, Thomas Cherro and Jeff Laine were coming in to the unit to threaten me with violence and possibly assault me in response of me not getting off the computer." (Pl.'s Decl. ¶¶ 23, 26.)

A conversation ensued between some of the Defendants and Plaintiff. (Noss Decl. Ex. T at 12:13:33.[3]) Laine described the interaction in his report this way: "I told Wickner that no one wanted to fight with him that we were here to talk about the problem. I asked Wickner to sit down at a nearby table, which he did." (Noss Decl. Ex. R [Doc. No. 65-5 at 2].) From the surveillance video the interaction appears to cool a bit. Plaintiff can be seen removing his gloves and sitting at a nearby table. (*Id.* at 12:15:12.)

After some back and forth dialogue, the interaction again grew more tense. Plaintiff returned to his feet and walked back over to the computer area. (Noss Decl. Ex. T at 12:15:44.) Conversation continued and Plaintiff again grew agitated, gesturing with

---

[3] Exhibit T of the Noss Declaration [Doc. No. 65] is the surveillance video from the unit during the time in dispute, which has been filed under seal with the court. Citations refer to the timestamp appearing on the screen.

his arms in a way that Defendants interpreted as increasing hostility.  (*Id*. at 12:15:45–

12:18:10; Laine Decl. ¶ 15; Cherro Decl. ¶ 13 [Doc. No. 69]; Bender Decl. ¶ 13 [Doc.

No. 70].)  Plaintiff reports that "Defendant Jeff Laine pulled out his flashlight and

threatened to hit me if I did not get off the computer and return to my room."  (Pl.'s Decl.

¶ 27.)  In his incident report, Laine indicated that Plaintiff "said firmly that he would not

return to his room until he was finished with his legal computer work."  (Noss Decl. Ex.

R [Doc. No. 65-5 at 2].)  After a few minutes, Plaintiff put his gloves back on and took a

few steps back from the security counselors.  (Noss Decl. Ex. T at 12:18:16.)  The

accounts differ about what Plaintiff said at that point; some heard words along the lines

of "I'll fight you if I have to," and others heard "Let's go."  (Noss Decl. Ex. Q [Doc. No.

65-4 at 2]; Ex. P [Doc. No. 65-3 at 2]; Pl.'s Decl. ¶ 28.)

    From there, things escalated quickly.  Laine shined his flashlight at Plaintiff's face

and instructed him to place his hands behind his back. (Noss Decl. Ex. T at 12:18:50; Ex.

R at 1.)  Plaintiff responded by pulling a nearby four-wheeled cart between himself and

Laine, Bender, and Cherro. (Noss Decl. Ex. T at 12:18:54.)  Plaintiff describes this act as

defensive, saying "I felt that the defendants were going to commence an assault at that

time and placed a cart between myself and defendant Jeff Laine to try and keep from

being hit with the flashlight that defendant Jeff Laine was wielding."  (Pl.'s Decl. ¶ 30.)

In his report, Cherro wrote that Plaintiff "grabbed a cart that was next to him with both

hands and it appeared that he was going to use it as a weapon."  (Noss Decl. Ex. Q.)

Bender and Cherro then sprayed Plaintiff in the face with a chemical irritant.[4]  (*Id*. at 12:19:00.)

Plaintiff did not yield but instead ran away, heading toward a set of stairs that led to the second level of the unit.  (Noss Decl. Ex. T at 12:19:03.)  Plaintiff states he was trying to return to his cell.  (Pl.'s Decl. ¶ 33.)  Laine, Cherro, and Bender ran after Plaintiff, who then turned over a plastic chair to stop or trip Bender.  (Noss Decl. Ex. T at 12:19:04; Pl.'s Dep. at 127.)  As Plaintiff turned to run up the staircase Laine sprayed him with more irritant.  (Noss Decl. Ex. T at 12:19:06.)  Plaintiff, apparently undeterred, continued up to the second level of the unit. (*Id*. at 12:19:07.)  Unlike the first level of the unit, which is a large open room, the second level is limited to a narrow walkway overlooking the main level.  (*Id.*)  The walkway runs along the far wall of the room, then turns a corner and runs the length of the room.  (*Id.*)  The walkway ends with a second staircase down to the first floor.  (*Id.*)  Laine followed Plaintiff up the stairs at the back of the room, but Cherro and Bender split off and went up the second set of stairs. (*Id*. at 12:19:24.)

Once on the second level, Plaintiff ran down the walkway to the corner, then turned and faced Laine with his right fist clenched.  (*Id*. at 12:19:15.)  Meanwhile, Cherro and Bender started to approach Plaintiff from the opposite direction, effectively cornering Plaintiff. (*Id*. at 12:19:21.)  When the three security counselors were within a few feet of him, Plaintiff ran toward Laine, who was in front of the stairway. (*Id*. at 12:19:26.)  Laine

---

[4] The chemical irritant was oleoresin capsicum, more commonly known as mace or pepper spray.  (Laine Decl. at ¶ 6 [Doc. No. 68].)

responded by spraying chemical irritant toward Plaintiff a final time. (*Id.*) The facility's nurse would later be told that Plaintiff was sprayed a total of six times. (Noss Decl. Ex. I [Doc. No. 65-1].)

Plaintiff attempted to run past Laine, but Laine caught him and wrapped his arms around Plaintiff. (Noss Decl. Ex. T at 12:19:28.) Bender came from behind to grab Plaintiff's legs and bring him to the ground. (*Id.* at 12:19:30.) The three men tumbled to the floor—Laine with his arms around Plaintiff's arms and torso, Bender holding Plaintiff at the hips—and landed at the edge of the open landing at the top of the staircase. (*Id.* at 12:19:32.)

Plaintiff claims that "Defendant Jeff Laine tackled me and immediately started choking me until I couldn't breathe." (Pl.'s Decl. ¶ 34.) The video footage of the incident is not consistent with his characterization, however. Instead it appears from the video that Laine's right arm, which was wrapped around Plaintiff's right shoulder as he grabbed him from behind, slipped up and off Plaintiff's shoulder in the tumble. (Noss Decl. Ex. T at 12:19:31.) Laine landed on top of Plaintiff in the fall and for a period of approximately two seconds Laine's arm was hooked around Plaintiff's neck. (*Id.* at 12:19:33.) There is no indication from the video that Laine pulled upward or backward against Plaintiff's neck or otherwise attempted to choke him—rather, he appears in the video to be using his hand to brace the two men from falling further over the open stairwell. (*Id.* at 12:19:34; Rosen Decl. ¶ 24 [Doc. No. 68].)

Plaintiff also alleges that during this time Bender "hit" or "punched" him. (Pl.'s Mem. Opp'n at 1, 5 [Doc. No. 77]; Am. Compl. ¶ 31 [Doc. No. 39]; Pl.'s Decl. ¶ 36.)

However, this assertion is not supported by the video footage or any other evidence beyond Plaintiff's declaration.  Plaintiff acknowledged as much during his deposition after reviewing the video footage, saying, "I did not see Robert Bender punching me, though, so I might change that [allegation in the Complaint]."  (Pl.'s Dep. at 134 [Doc. No. 65-1].)

A few seconds after the three men landed on the floor, Cherro and security counselor Corrine Halveron-Hoadley arrived to help secure Plaintiff and place wrist restraints on him.  (Noss Decl. Ex. T at 12:19:34.)  Plaintiff did not appear to be resisting at this point.  (*Id*.)  The entire physical encounter—from the time Plaintiff pulled the cart between him and Defendants to the time Plaintiff was restrained at the top of the second floor stairway—had lasted less than a minute.  (*See generally* Noss Decl. Ex. T.)  Cherro and Laine stood Plaintiff up, walked him down the stairs, and escorted him out of the Unit.  (*Id*. at 12:20:55.)

Defendants Dreher and Furey received Plaintiff in the "High Security Area," where they allowed him to shower for decontamination from the chemical irritant residue.  (Pl.'s Dep. at 156–57.)  There is some disagreement about how long Plaintiff was permitted to shower, but the parties agree it was at least 10 seconds, and potentially much longer.[5]  (*Id.*; Pl.'s Decl. ¶ 37; Noss Decl. Ex. F.)  Plaintiff was given new clothing and placed in a room to await medical examination.  (Noss Decl. Ex. K [Doc. No. 65-1].)

---

[5] In his report of the events of the day Dreher describes the decontamination: "Wickner was escorted into the HSA shower and the water was turned on.  Wickner remained in the shower for a few minutes under staff supervision.  When Wickner finished decontamination in the shower his face was dried with a towel."  (Noss Decl. Ex. F.)

Eileen Christie, a registered nurse employed by the facility, arrived approximately five minutes later (around 12:30 p.m.) to evaluate Plaintiff for any injuries or pain. (Noss Decl. Ex. I.) Plaintiff complained of pain in his left hip and elbow, ringing in the ears, and a slight headache. (*Id.*) Christie found no obvious bumps, bruises, or swelling in the head area. (*Id.*) Plaintiff was "able to converse [without] any apparent respiratory distress or shortness of breath." (*Id.*) Christie did observe that Plaintiff was having a "local reaction" to the chemical irritant, resulting in "slightly raised and red splotches on his neck and face," but noted that Plaintiff did not report "any burning or itching on his skin." (*Id.*) Christie proscribed Plaintiff ibuprofen three times per day for three days and told him to notify staff if his tinnitus continued into the next day. (*Id.*)

According to Plaintiff, approximately three hours later (around 3:30 p.m. or 3:50 p.m.), Plaintiff told Defendant Rosen, another security counselor, that the chemical irritant was still burning his face and that he wanted to take another shower to wash it off. (Pl.'s Dep. at 161–62.) Plaintiff also stated he wanted to sign up for the Hospital Review Board (HRB).[6] (*Id.*; Noss Decl. Ex. G [Doc. No. 65].) According to Plaintiff, Rosen "told [Plaintiff] he would look into it." (Pl.'s Decl. ¶ 46.) Plaintiff states he spoke to Rosen again, around 4:00 p.m., and Rosen told him that "[Rosen] couldn't let [Plaintiff] take a shower until after the first 24 hours of placement, and that [Plaintiff] would just have to bear it out until the burning sensations went away." (Pl.'s Decl. ¶ 47.)

Rosen made a contemporaneous report of his interactions with Plaintiff (time

---

[6] The HRB is a panel that reviews client complaints and their treatment. *See* Minn. Stat. §§ 253D.04, 253B.22.

stamped at 4:09 p.m.) in which he noted Plaintiff's request to see the HRB, but did not

report Plaintiff's request for another shower.  (Noss Decl. Ex. G.)  The entire note reads:

"On the above date and time I, S.C. Tyler Rosen, was informed by client Lance Wickner

that he would like to be seen by the HRB (Hospital Review Board). Per policy I informed

his CRC (Client Rights Coordinator) by both emailing and leaving a voicemail on CRC

Natalie Steinhart's phone and computer."  (*Id.*)  Defendants do not dispute that Plaintiff

did not get to take a second decontamination shower.

## II.    DISCUSSION

Plaintiff brings claims under 42 U.S.C. § 1983 for violations of the Fourteenth

Amendment.  Specifically, he alleges that: (1) Defendants Bender, Cherro, and Laine

used unnecessary and excessive force against him, and (2) Defendants Dreher, Furey, and

Rosen were deliberately indifferent to his serious medical needs.  Plaintiff sues all

Defendants in their individual capacities, and he seeks compensatory and punitive

monetary damages.  Defendants move for summary judgment on all claims.

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  A dispute over a fact is "genuine" only if the evidence is such that

a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "material" only if its

resolution might affect the outcome of the suit under the governing substantive law.  *Id.*

In considering a motion for summary judgment, the court views the evidence and the

inferences that may be reasonably drawn from the evidence in the light most favorable to

the nonmoving party. *Enter. Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996).

"Once the moving party has made and supported their motion, the nonmoving party must proffer admissible evidence demonstrating a genuine dispute as to a material fact." *Holden v. Hirner*, 663 F.3d 336, 340 (8th Cir. 2011). The party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 256. "Like any other civil litigant," a pro se plaintiff must respond to a defendant's motion for summary judgment "with specific factual support for his claims" sufficient to sustain a jury verdict in his favor. *Beck v. Skon*, 253 F.3d 330, 333 (8th Cir. 2001); see *Anderson*, 477 U.S. at 249–52.

## A.    Excessive Force Claims

Plaintiff first claims that Defendants Bender, Cherro, and Laine violated his Fourteenth Amendment rights because they used unnecessary and excessive force against him. (Am. Compl. at 4.)

The protection against excessive force has its roots in the Eighth Amendment prohibition against "cruel and unusual punishments." *Andrews v. Neer*, 253 F.3d 1052, 1061 (8th Cir. 2001). Since Plaintiff was civilly committed—not a prisoner—during the events giving rise to this lawsuit, the Eighth Amendment is not directly applicable here. However, "it is well established that the Constitution prohibits governmental authorities from using excessive force against individuals who are being held in custody." *Martin v. Benson*, No. 09-195, 2010 WL 2925116 *6, (D. Minn. June 14, 2010), *R. & R. adopted*,

2010 WL 2925104 (D. Minn. July 21, 2010), *aff'd*, 407 F. App'x. 986 (8th Cir. 2011) (per curiam).  Claims raised by civilly committed individuals for excessive force are treated the same as pretrial detainee claims, *id.,* and therefore arise under the Fourteenth Amendment's Due Process Clause.  *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007). For that reason, Plaintiff properly frames his claim in terms of the Fourteenth Amendment and seeks redress under 42 U.S.C. § 1983.

To prove a claim for excessive force under 42 U.S.C. § 1983, a plaintiff "must show . . . that the force purposely or knowingly used against him was objectively unreasonable."  *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).  The objective reasonableness test "turns on the 'facts and circumstances of each particular case.'"  *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight."  *Id.*  In applying this standard, the Court considers the following factors:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.*  The Court "must also account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (citation and internal quotations omitted).

11

Plaintiff alleges Defendants used excessive force in two ways: first, their repeated use of a chemical irritant spray, and second, the manner in which they wrestled Plaintiff to the ground and restrained him. (Pl.'s Mem. Opp'n at 4–6 [Doc. No. 77].) Defendants contend their conduct was reasonable given the circumstances of the situation and does not rise to the level of a constitutional violation. (Defs.' Mem. Supp. 15 [Doc. No. 64].)

### 1.    Use of Chemical Irritant

Plaintiff first complains that Defendants used chemical irritant on him without warning. It is undisputed that, at the time of the incident, Plaintiff had repeatedly failed to follow the clear directives of the MSOP security counselors. He initially refused to get off the computer, and later, when the ICS system was activated, he refused to go back to his room. He also put gloves on and appeared to posture himself aggressively. It is also undisputed that Defendants attempted to talk with Plaintiff and obtain his compliance through non-physical means for several minutes.

Bender and Cherro first sprayed Plaintiff with the chemical irritant after Plaintiff showed further hostility by positioning a cart between himself and the security counselors. Both Bender and Cherro maintain that "there was not time, and it would not have been safe, to warn Wickner" before spraying the irritant. (Bender Decl. ¶ 17; Cherro Decl. ¶ 17.) Plaintiff does not provide evidence to the contrary.

Courts have found the use of force to this degree, including the tackling or tasering of a person, justified if the person resists, refuses to comply with the officer's commands, or otherwise poses a danger to the officer or the general public. *See e.g. Carpenter v. Gage*, 686 F.3d 644, 649 (8th Cir. 2012) (affirming the district court's ruling on summary

judgment that it was reasonable for a police officer to use a taser against suspect who refused to comply with the officer's instructions); *McKenney v. Harrison*, 635 F.3d 354, 360 (8th Cir. 2011) (finding it proper to use taser on individual who "made a sudden movement toward [a] window, which the officers reasonably interpreted as an active attempt to evade arrest by flight"). The use of chemical irritant has also been deemed a "tempered response by prison officials." *Jones v. Shields*, 207 F.3d 491, 496 (8th Cir. 2000). Under these standards, Defendants' initial application of chemical irritant on Plaintiff following continued resistance and his sudden movement with the nearby cart was reasonable.

Plaintiff also complains that the subsequent uses of chemical irritant were excessive. The Eighth Circuit has held that repeated uses of chemical irritant are permissible after continued "aggressive act[s] of defiance." *Burns v. Eaton*, 752 F.3d 1136, 1140 (8th Cir. 2014) (granting summary judgment for defendant when three instances of pepper spray use came after each "aggressive act of defiance"); *see also Procknow v. Curry,* 26 F.Supp.3d 875, 887–88 (D. Minn. 2014) (finding that two uses of a taser were justified and reasonable because the plaintiff was still resisting arrest). That is the case here, where preceding each spray Plaintiff was actively resisting or even escalating the severity of the situation. For example, the first time Laine sprayed Plaintiff was at the base of the stairs, just before Plaintiff turned to run up them and immediately after Plaintiff tipped over a plastic chair with the intent of stopping or tripping Defendant Bender. (Noss Decl. Ex. T at 12:19:06; Pl.'s Dep. at 127.) He was sprayed again after he backed himself in a corner, made a fist, and then charged at Laine. (Noss Decl. Ex. T at

12:19:15.)[7]  Defendants' actions amount to unconstitutional excessive force only if they are "not rationally related to a legitimate governmental objective or . . . [are] excessive in relation to that purpose."  *See Kingsley*, 135 S. Ct. at 2473–74.  Here, the subsequent sprays of chemical irritant were rationally related to Defendants' interest in maintaining order and security.  No reasonable juror could find otherwise.  Accordingly, Defendants' successive sprays of chemical irritant on Plaintiff were reasonable.

### 2.    Defendants' Take-down of Plaintiff

The final alleged use of excessive force relates to how Laine and Bender wrestled Plaintiff to the ground and restrained him.  In particular, Plaintiff argues that during the take-down, Bender "punched him in the hip while Laine was choking him."  (Pl.'s Mem. Opp'n at 4.)  But at various times Plaintiff has walked back these allegations.  He acknowledged in his deposition that he "[didn't] see Robert Bender punching me in the video."  He ultimately concluded he was "seventy-five to eighty percent sure" that Bender did not punch him, and even went so far as to comment that he might change that allegation in his Complaint.  (Pl.'s Dep. at 134, 137–39.)  As for Laine, although Plaintiff asserts that Laine choked him, or at least that Laine had his arm "wrapped around [Plaintiff's] neck," (*Id.* at 132) he acknowledged that "the video speaks for itself" (*Id.*).

---

[7] Plaintiff asserts that he was not charging at Laine, but rather trying to get past him to return to his cell.  (*See* Pl.'s Decl. ¶ 33.)  Even if his "motive" behind these actions was "innocent, the [Defendants] on the scene reasonably could have interpreted [Plaintiff's] actions as [continued] resistance and responded with an amount of force."  *Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012).  The open stairwell immediately behind Laine further enhanced the apparent risks, both to Plaintiff and to Laine, of Plaintiff's sudden move.

Courts have found that other forms of force "may be much more humane and effective than a flesh to flesh confrontation with an inmate." *Jones v. Shields*, 207 F.3d 491, 496 (8th Cir. 2000) (citation omitted).  But that does not mean the force applied by Defendants here was excessive.  First, the most severe acts of physical force of which Plaintiff complains—being choked by Laine and punched by Bender—are clearly refuted by the video record.   The only sworn evidence before the Court that Bender punched Plaintiff or that Laine choked him is found in Plaintiff's own affidavit.  (Pl.'s Decl. ¶¶ 34–36.)  But "it is black letter summary judgment law that a conclusory, self-serving affidavit will not defeat an otherwise meritorious summary judgment motion." *Keiran v. Home Capital, Inc.*, 858 F.3d 1127, 1132 (8th Cir. 2017), *cert. denied*, 138 S. Ct. 981 (2018).  Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372 (2007).

Here, Plaintiff's assertion that Laine choked him is plainly contradicted by video evidence.  (*See* Noss Decl. Ex. T.)  Even Plaintiff acknowledged that the video "speaks for itself."  (Pl.'s Dep. at 132.)  Similarly, as Plaintiff admitted, nowhere in the video can Bender be seen punching him.  Therefore, the Court may adopt the facts depicted in the video recording over the version put forth by Plaintiff.  *See Scott*, 550 U.S. at 380–81 (finding that "Respondent's version of events [was] so utterly discredited by the record that no reasonable jury could have believed him," and, therefore, "[t]he Court of Appeals . . . should have viewed the facts in the light depicted by the videotape").

15

Furthermore, even if Plaintiff's now (at most) equivocal claims that he was punched or choked were sufficient to create a genuine issue as to whether that conduct occurred, the Court finds no basis upon which a jury could conclude that, in the circumstances here, such use of force was excessive.  Instead, the evidence clearly demonstrates that Bender and Laine applied an appropriate amount of physical force, relative to the circumstances they faced, in order to gain control over Plaintiff and restore order within the facility.  Moreover, that physical force immediately ceased once Plaintiff stopped resisting and the situation dissipated.  *See Ryan v. Armstrong*, 850 F.3d 419, 428 (8th Cir. 2017) (affirming the district court's grant of summary judgment as to defendants' reasonable use of force because it was "restricted to the period in which [the Plaintiff] was fighting the defendants' efforts to subdue him").  The Court therefore finds that there is no evidence raising a genuine issue of material fact from which a reasonable jury could find that the force used by Defendants in bringing Plaintiff to the ground and restraining him was not justified and reasonable.

The Court also observes that Plaintiff does not complain of any sustaining injury from either the use of the chemical irritant or the take-down.  *See Robinson v. Hawkins*, 937 F.3d 1128, 1136 (8th Cir. 2019) ("While a *de minimis* injury does not preclude a claim of excessive force, the nature of any injuries suffered may still inform our understanding of the force used.").  An initial assessment of Plaintiff following the incident revealed no "bruising, redness, or swelling."  (Noss Decl. Ex. I.)  After the skin irritation subsided, Plaintiff's only complaints were a continued ringing in his ears and pain in one of his hips, both of which have resolved.  (Pl.'s Dep. at 167.)  These

conditions do not give rise to an inference that Defendants used force disproportionate to the circumstances.

As a result, the Court recommends that summary judgment be granted to Defendants Bender, Cherro, and Laine on Plaintiff's § 1983 excessive force claims. The facts of record, viewed in the light most favorable to Plaintiff, create no genuine issue for trial, but establish that Defendants are entitled to judgment as a matter of law.

### B.   Deliberate Indifference Claims

Plaintiff's second claim is that Defendants Dreher, Furey, and Rosen violated his Fourteenth Amendment rights by their "deliberate indifference to his serious medical need when they failed to properly decontaminate him" following the use of chemical irritant. (Pl.'s Mem. Opp'n at 7 [Doc. No. 77].)

"[W]here a [civilly-committed] patient's Fourteenth Amendment claim is for constitutionally deficient medical care, we apply the deliberate indifference standard from the Eighth Amendment." *Scott v. Benson*, 742 F.3d 335, 339 (8th Cir. 2014) (citing *Senty-Haugen v. Goodno*, 462 F.3d 876, 889–90 (8th Cir. 2006)); *see also Curtiss v. Benson*, 583 F. App'x. 598 (8th Cir. 2014) (per curiam) (same). The standard for deliberate indifference under the Eighth Amendment "entails something more than mere negligence, [and] . . . something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). To prevail on his claim, Plaintiff

17

"must demonstrate (1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997).

### 1.    Objectively Serious Medical Need

"A medical need is objectively serious if it either has been diagnosed by a physician as requiring treatment or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Scott*, 742 F.3d at 340 (internal quotations omitted). Plaintiff must show through "'verifying medical evidence' that the defendants ignored an acute or escalating situation or that delays adversely affected the prognosis given the type of injury in this case." *Dulany*, 132 F.3d at 1243 (citation omitted).

The Court has reservations about whether the effects of being sprayed with a chemical irritant amounts to an "objectively serious medical need." *See Burns*, 752 F.3d at 1140 (affirming the lower court's summary judgment that an inmate "made no sufficient showing of a serious medical need" despite being sprayed with pepper spray three times); *Allen v. Bosley*, 253 F. App'x 658, 660 (9th Cir. 2007) (finding that "the transitory effects of the pepper spray" do not amount to a serious medical need); *Aikens v. Kelley*, No. 5:17-CV-247-JM-BD, 2018 WL 3452203, at *2 (E.D. Ark. May 17, 2018), *R. & R. adopted*, No. 5:17-CV-247-JM-BD, 2018 WL 2452963 (E.D. Ark. May 31, 2018) (finding that inmate had not "demonstrated that he suffered from a serious medical need" despite being sprayed with a chemical irritant and "not permitted to decontaminate himself for hours").

18

In any event, Plaintiff cannot show the first of the two prongs established by *Scott*, since his medical need was not "diagnosed by a physician as requiring treatment."  742 F.3d at 340.  Plaintiff was seen by a nurse minutes after the incident, but he made "[n]o reports of any burning or itching on his skin."  (Noss Decl. Ex. I.)  Plaintiff did not evidence any physical manifestations of an "acute or escalating" medical crisis: he did not have signs of breathing problems or "respiratory distress," and had only "slightly raised and red splotches on his neck and face."  (*Id.*)

As for the second *Scott* prong, a medical condition can be objectively serious if it is "so obvious that even a layperson would easily recognize the necessity for a doctor's attention."  *Id.*  But this path is also unavailing.  Plaintiff does not have medical findings to support his claim; rather he relies solely on his personal assessment that the irritant "caus[ed] a burning sensation for approximately 4 to 5 hours" to support his claim that his medical condition was acute and escalating.[8]  (Pl.'s Decl. ¶ 31.)  Furthermore, Plaintiff acknowledges that the symptoms subsequently resolved, and he makes no claim that a delay in care led to exacerbation or any lasting effects.  (*See* Pl.'s Dep. at 167–68; Pl.'s Decl. ¶ 34.)  This evidence is insufficient as a matter of law to support a finding that any delay in his medical care constituted deliberate indifference.  *See, e.g.*, *Prosser v. Nagaldinne*, 927 F. Supp. 2d 708, 734–35 (E.D. Mo. 2013) (granting summary judgment based on finding that a limp, subjective complaints, and self-diagnosis of "foot drop" were not sufficient evidence to establish deliberate indifference on the part of the

---

[8] Plaintiff is inconsistent on this point.  At one point he estimated the effects of the chemical irritant "lasted around 27 hours."  (Pl.'s Dep. at 167.)

prisoner's treating physician); *Kunze v. Diehl*, 345 F. Supp. 2d 1031, 1034 (D.N.D 2004) (finding patient's subjective complaints and self-diagnosis of cancer, after receiving many physical exams and medical tests, were insufficient to sustain an Eighth Amendment claim).

The Court therefore concludes that Plaintiff has failed to demonstrate that he experienced an objectively serious medical need.

### 2.    Actual Knowledge and Deliberate Disregard

Even if Plaintiff could show an objectively serious medical need, he would still have to show that one or more of the Defendants "actually knew of but deliberately disregarded his serious medical need." *Scott*, 742 F.3d at 340. This standard requires more than ordinary negligence; it is more akin to criminal recklessness. *Olson v. Bloomberg*, 339 F.3d 730, 736 (8th Cir. 2003); *Martinson v. Leason*, 22 F. Supp. 3d 952, 960 (D. Minn. 2014) ("The plaintiff must show more than negligence, more even than gross negligence.") (internal quotation marks omitted). In the context of incarceration, "deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citation omitted).

Plaintiff was sprayed with chemical irritant around 12:15 p.m. and just minutes later received responsive care. Dreher and Furey gave him a shower, clean clothes, and prompt attention from medical personnel. Plaintiff is not clear what more he expected Dreher and Furey to do, but in his declaration, Plaintiff asserts that "MSOP has an approved cleaning agent that negates the chemical irritants effect." (Pl.'s Decl. ¶ 41

20

[Doc. No. 78].)  Plaintiff does not elaborate, nor does he state on what basis he makes this assertion, and there is no evidence that Dreher and Furey were personally aware of other available decontamination techniques, let alone that such options were superior to showering in Plaintiff's situation.[9]  While Plaintiff may have wished for a different form of treatment or an alternative method of decontamination, the Eighth Amendment does not recognize a "constitutional right to receive a particular or requested course of treatment."  *Dulany*, 132 F.3d at 1239.

Far from the "serious" or nearly criminal level of recklessness required by the standard, Dreher and Furey offered Plaintiff decontamination consistent with their training, and then sought out medical care for him.  Plaintiff did not convey to them that he had any further medical needs, and there is no evidence whatsoever to support Plaintiff's assertion that Dreher and Furey disregarded Plaintiff's condition.  The Court thus finds that there is no evidence upon which a reasonable jury could conclude that Dreher and Furey exhibited deliberate indifference to Plaintiff's medical need.

Plaintiff also alleges Rosen exhibited deliberate indifference by not allowing him to take a second shower.  (Pl.'s Mem. Opp'n at 7.)  However, Rosen knew that Plaintiff had already taken a shower for the purpose of decontamination—a fact Plaintiff implicitly acknowledged when he told Rosen he wanted to "get decontaminated *again*."  (Pl.'s Dep. at 161–62.)  Rosen had been trained that one "fresh water shower" was the

---

[9] Dreher and Furey both stated under oath that they had been trained to use water as an effective means of decontamination.  (Dreher Decl. ¶¶ 11, 14 [Doc. No. 71]; Furey Decl. ¶¶ 9, 12 [Doc. No. 72].)

appropriate chemical irritant decontamination method.  (Rosen Decl. ¶ 3 [Doc. No. 73].)

"Deliberate indifference must be viewed from the defendant's perspective at the time in

question," *Patrick v. Lewis*, 397 F.Supp.2d 1134, 1141 (D. Minn. 2005).  From Rosen's

perspective, Plaintiff had already been appropriately decontaminated.  The Court

therefore finds that there is no evidence upon which a reasonable jury could find Rosen

exhibited deliberate indifference to Plaintiff's condition.

Accordingly, the Court concludes that no trier of fact could reasonably find that

the way Dreher, Furey, or Rosen handled Plaintiff's treatment following the use of the

chemical irritant violated Plaintiff's rights under the Fourteenth Amendment.  They are

therefore entitled to summary judgment on his claims.[10]

## III.    RECOMMENDATION

Based on the foregoing and all of the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1.  Defendants' Motion for Summary Judgment [Doc. No. 62] be

    **GRANTED**;

2.  Plaintiff's claims be **DISMISSED WITH PREJUDICE**; and

3.  **JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  December 5, 2019

                                                    *s/ Hildy Bowbeer*
                                                    HILDY BOWBEER
                                                    United States Magistrate Judge

---

[10] Because the Court concludes that no trier of fact could find that Defendants' treatment
of Plaintiff violated the Eighth Amendment, the Court does not address Defendants' other
arguments in support of their motion—namely, that the doctrine of qualified immunity
immunizes them from suit.  (Def. Mem. Supp. at 27 [Doc. No. 64].)

## **NOTICE**

**Filing Objections**: This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).